UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 3:11-CR-078 JD |
| | ) |
| JASON BUZZARD (02) | ) |

**Opinion and Order**

On February 13, 2012, Jason Buzzard pleaded guilty to one count of conspiring to manufacture more than 50 grams of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 846, and on June 27, the Court accepted that plea and adjudged Mr. Buzzard guilty. On August 16, 2012, the Court held a sentencing hearing for Mr. Buzzard, at which time it took evidence and heard argument regarding the application of the sentencing guidelines. Specifically, the parties addressed the application of a sentencing enhancement for possessing a firearm in connection with the offense under U.S.S.G. § 2D1.1(b)(1) and the proper quantity of drugs—specifically methamphetamine and pseudoephedrine—to attribute to him for purposes of determining his base offense level under U.S.S.G. § 2D1.1(c). *See* DE 237, 263. The Court then continued the sentencing hearing to allow the parties to brief the Court on their respective positions and to issue a written ruling. The Court concludes that the firearm enhancement applies and that Mr. Buzzard's base offense level is 32, albeit for different reasons than suggested by the government.

**I. Factual Background**

As recounted in the undisputed facts in the presentence investigation report, this case began in January 2010 when South Bend Police did trash pulls at a residence at 1725 Phillipa in South

Bend. *See* PSR, DE 219, ¶ 6. Officers found items associated with methamphetamine production and obtained a warrant to search the home. *Id.* On January 13, police executed the search warrant and found Mr. Buzzard, Zachary Martin, and Nicole Garcia, among others, in the home. *Id.* Police also discovered an active methamphetamine lab in the garage, and devices for smoking methamphetamine, other items with methamphetamine residue on them, and a small bag of white powder containing a half gram of methamphetamine in the residence.[1] *Id.* They also found a loaded rifle under the bed in which Mr. Buzzard was sleeping. *Id.* Mr. Buzzard was arrested, *see* Govt. Memo, DE 242 at 2, and his probation for a previous conviction for possession of methamphetamine was eventually revoked. *See* PSR, ¶ 69. He was released again on May 26, 2010. *Id.* ¶ 67.

After the January search, police interviewed Zack Martin at the St. Joseph County Jail. *See* Martin Stmt., DE 242-1 at 1. He claimed that he had started "getting back into" methamphetamine again about six weeks before, when he started getting methamphetamine from Jason Buzzard. He also stated that Jason Buzzard and his girlfriend (Nicole Garcia) had been staying at Martin's home on Phillipa for about four weeks. *Id.* Mr. Buzzard had brought the lab that officers had found in the back yard and had cooked two times previously. *Id.* at 2. It was also Mr. Buzzard's job to get rid of the methamphetamine-related trash in the garage. *Id.*

On April 7, while Mr. Buzzard was in custody, police executed more search warrants at Phillipa St. and the neighboring 1718 S. Olive St., in South Bend. PSR, ¶¶ 7, 28. Between the two residences, police found a total of 149.4 grams of pseudoephedrine and 15 grams of methamphetamine. *Id.* Just before they executed the warrant, police observed a car leave the

---

[1] Absent any evidence to the contrary, the Court assumes that these references to weights of "methamphetamine" refer to weights of a mixture or substance containing methamphetamine and not methamphetamine (actual).

Phillipa residence with Zack Martin, Alicia Hite, and Shayla Montague. *Id.* Lamarco Beard was also seen leaving the residence before the police arrived.[2] *Id.*

Over the summer, investigators observed other activities linked to the conspiracy. In July, law enforcement responded to a call from a neighbor who had discovered what appeared to be a methamphetamine lab and chemicals in the woods outside 19341 Lincolnway in Plymouth. *Id.* ¶ 8. Testing revealed an active methamphetamine lab, 9.23 grams of methamphetamine, and the fingerprints of Dale Hite and Stephen Braasch. *Id.* Over the next month, police pulled over several people leaving the Lincolnway residence and discovered methamphetamine and methamphetamine labs in the vehicles. *Id.* ¶¶ 9–11. On August 29, police stopped Lamarco Beard in route to the Lincolnway residence with 216 pseudoephedrine pills: according to the presentence report, "[t]he pseudoephedrine pills recovered in this incident weighed 17.28 grams." *Id.* ¶ 12.

Between August 14 and October 14, law enforcement also had a pole cam mounted outside the Lincolnway residence which recorded the comings and goings of the various members of the conspiracy, including Mr. Buzzard. *Id.* ¶ 14. Analysis of the recordings shows that Lamarco Beard—the main source for pseudoephedrine—visited the residence 12 times between August 14 and September 29. *Id.* ¶ 18. Two other smaller pseudoephedrine suppliers, Nicole Garcia and Shayla Montague visited the residence 10 and 5 times respectively, bringing "2-3 boxes of pseudoephedrine per week". *Id.* ¶ 17, 19. Mr. Buzzard was seen visiting a total of 8 times over the two months of observation. *Id.* On October 7, officers served a search warrant at the Lincolnway residence. *Id.* ¶ 15. They discovered Mr. Buzzard in the home with Alicia Hite, Shayla Montague, and Nicole

---

[2]Lamarco Beard is identified by an alias "Anthony Beard" in several of the documents and he was originally indicted under that name.

Garcia, as well as an active methamphetamine lab in the garage and methamphetamine in Mr. Buzzard's pocket. *Id.* Although it is not listed in the presentence report, the government has also provided evidence that 25.2 grams of pseudoephedrine were found in the home at the time of the search. *See* Govt. Reply Brief, DE 253, Ex. 8.

Alicia Hite gave a detailed statement. *See* PSR, ¶ 15.[3] She explained that Mr. Buzzard, along with Stephen Braasch, Dale Hite, Zack Martin, and Andy Mitchell had cooked methamphetamine at the Lincolnway residence. *See* Hite Stmt., DE 198-1 at 1, 2. Lamarco Beard was the largest supplier of pseudoephedrine for the conspiracy, usually bringing between 10 and 20 boxes at least twice a week for $800 or so. *Id.* at 2–3. Others, including Shayla Montague and Nicole Garcia regularly delivered much smaller amounts of pills. *See* PSR, ¶ 17. Andy Mitchell and Steve Braasch would steal the necessary anhydrous ammonia most of the time, and Hite's aunt would provide other supplies such as Coleman fuel and lithium batteries. *See* Hite Stmt. at 4. Regarding Mr. Buzzard, she stated that he cooked methamphetamine, including the day before, but did not buy pills. *Id.* at 1. She did not know where Mr. Buzzard cooked, but stated that he and Andy Mitchell usually worked together. *Id.* at 2, 5.

## II. Procedural History

**A.    The Presentence Report**

After Mr. Buzzard pleaded guilty to the charges in February, the Court ordered a presentence report. The presentence report recounted many of the facts laid out above and concluded that Mr.

---

[3]The presentence report summarizes this statement. The statement itself was filed by the government on June 26, 2012, as part of Ms. Hite's sentencing. *See* DE 198-1. At the sentencing hearing, the parties agreed that the Court could consider Ms. Hite's statement for Mr. Buzzard's sentencing as well. *See* DE 263 at 53–54.

Buzzard should be held responsible for a total 28.17 grams of methamphetamine and 169.53 grams of pseudoephedrine recovered during the investigation of the conspiracy. *See* PSR, ¶ 34. It also found that he should be responsible for an additional 138.24 grams of pseudoephedrine, which was calculated using Mr. Buzzard's 8 recorded visits to the Lincolnway residence and the 17.28 grams found in Lamarco Beard's car on August 29. *Id.* The PSR attributed a total marijuana equivalency to Mr. Buzzard of 3,134.04 kilograms, resulting in a base offense level of 34. *Id.* ¶¶ 34, 40. The PSR also enhanced this offense level by 2 levels because Mr. Buzzard possessed a firearm in connection with the offense. *Id.* ¶ 41. Mr. Buzzard objected to the firearm enhancement, but did not initially contest the drug quantity findings. *See* Addendum to PSR, DE 219 at 26.

**B.     The Sentencing Hearing**

Before the sentencing hearing, the Court contacted counsel and informed them that it had concerns about the methodology the PSR used to calculate drug quantity and that it planned to bifurcate the sentencing hearing to allow argument and evidence on the proper guidelines calculations, including Mr. Buzzard's objection to the firearm enhancement and the drug quantity issue that the Court was raising on its own. Defense counsel then filed a sentencing memorandum objecting, for the first time, to the drug quantities calculated in the PSR, and renewing Mr. Buzzard's objection to the firearm enhancement. *See* Def. Sent. Memo., DE 231.

At the sentencing hearing, the Court first asked the parties to address the firearm enhancement. Defense counsel indicated that after conversations with counsel for the government, Mr. Buzzard had decided to withdraw his objection to the firearm enhancement in exchange for the government's agreement to continue to recommend acceptance of responsibility and move for a downward departure for substantial assistance under guideline section 5K1.1, and to refrain from

seeking an enhancement for obstruction of justice. *See* Transcript, DE 263 at 4. Defense counsel explained that "the government has substantial evidence on their side and that we cannot risk contesting that." *Id.* At the Court's request and to ensure there was an appropriate factual basis for the enhancement, the government also proffered the evidence it would have used to prove the enhancement, which included statements from two co-conspirators that the firearm was in fact Mr. Buzzard's, and the fact that the guns were found in the room with him during the January 2010 search. *Id.* at 4–5.

Turning to the issue of drug quantity, the Government called Trooper Keith Bikowski of the Indiana State Police to testify regarding what he had learned during the investigation of the conspiracy. *Id.* at 9. He recounted the January 2010 search of the Phillipa residence in South Bend, and verified that the amounts of pseudoephedrine found that day, as listed in the PSR, referred to the weight of the pseudoephedrine itself, not the pills, and that this was determined by multiplying the number of pills by the amount of the active ingredient pseudoephedrine in each. *Id.* at 12–13. He also clarified that when Lamarco Beard was stopped in late August, he was carrying 216 pills, which amounted to 17.28 grams of pseudoephedrine—not 17.28 grams of pills—to the Lincolnway residence. *Id.* at 14.

Trooper Bikowski had no "direct" evidence that Mr. Buzzard cooked or how much he cooked, but he testified about what he had learned from the statements from various co-conspirators about the conspiracy and the role of Mr. Buzzard and others. Trooper Bikowski recalled that Mr. Buzzard "was one of the main cooks for the operation"—though not as active as Dale Hite or Zack Martin—but he couldn't remember exactly how long he had been cooking for the conspiracy. *Id.* at 17–18, 44. Mr. Buzzard would cook methamphetamine and then give the product to Alicia Hite.

6

*Id.* at 43–44. Trooper Bikowski indicated that Mr. Buzzard was "one of the main cooks," *id.* at 18, and repeatedly testified that he cooked "at least once a week," stating that this estimation was based largely on his activities during two raids, the fact that Mr. Buzzard visited the Lincolnway residence eight times over a six to eight week period and the belief that he cooked every time, as well as the statements of various co-conspirators. *Id.* at 18, 24–25. He could not estimate how much pseudoephedrine Mr. Buzzard cooked into methamphetamine each time he cooked: it was his impression that Mr. Buzzard and the other cooks would cook anytime they had enough materials, so there would not have been a consistent amount. *Id.* at 23.

Trooper Bikowski also testified that the various cooks sometimes cooked together, but that there was no way of knowing how often they cooked together and how often they cooked separately. *Id.* at 43. He specifically mentioned a stabbing between Mr. Buzzard and Andy Mitchell that had occurred while they were cooking, as well as the fact that Mr. Buzzard was with Zack Martin and others at the Phillipa residence when an active methamphetamine lab was discovered in January 2010. *Id.* at 47.

## C. Supplemental Briefing

At the end of the sentencing hearing, the Court provided counsel an opportunity to submit supplemental briefing on the drug quantity issue. In its initial brief, the government supported the method of approximation in the PSR—using the 17.28 grams recovered during the traffic stop of Lamarco Beard as a base figure and multiplying that by the number of visits Mr. Buzzard made to the home. *See* DE 242. The government did, however, state that it now believes that Mr. Buzzard should not be held responsible for any drugs recovered while he was in custody between January 13 and May 26, 2010, and that an offense level of 32, rather than 34, is therefore appropriate. *Id.*

at 2. In response, Mr. Buzzard attacked the reliability of *all* the pseudoephedrine amounts and argued that the Court should use only the 28.22 grams of methamphetamine recovered during the course of the conspiracy, which would result in a base offense level of 20. *See* DE 252. In its reply, the government provided police reports and photographs demonstrating that the amounts of pseudoephedrine listed reflect the weight of the active ingredient, and urging that "attributing 17.2 grams of pseudoephedrine to Mr. Buzzard for each of his eight trips on the pole cam to the Plymouth house is a conservative, but fair number to total of his involvement." *See* DE 253 at 5.[4]

### **III. Analysis**

The government must prove the amount of drugs attributable to a defendant by a preponderance of the evidence. *United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007). Mr. Buzzard did not initially object to any of the factual premises underlying the drug quantity calculation—though at the sentencing hearing and subsequent briefing he questioned the manner in which the total weight of pseudoephedrine was calculated from the pills recovered during the investigation. At the hearing, the parties agreed that in resolving the drug quantity dispute, the Court could properly consider the statements made to law enforcement officers by Alicia Hite, which was filed by the government in relation to Ms. Hite's sentencing, *see* DE 198-1, as well as the unchallenged facts in the presentence report, the evidence at the hearing and any additional evidence the parties provided as part of their briefing. *See* DE 263 at 53–54. Mr. Buzzard has now withdrawn his objection to the firearm enhancement and other than an objection to the calculation of the weight

---

[4]The government also provided an exhibit detailing the amount of pseudoephedrine found at the residence at which Mr. Buzzard was arrested in July of 2011. The Court does not understand how these pills relate to relevant conduct for a conspiracy offense that ended nine months earlier, and does not consider this evidence in any way in determining the appropriate drug quantity in *this* case.

of the pseudoephedrine recovered during the investigation, which the Court addresses below and overrules, the facts in the presentence report are not in dispute. Therefore, the Court adopts the factual findings of the presentence report, relative to the offense conduct (paragraphs 1–33, 35) and Mr. Buzzard's criminal history and personal characteristics (paragraphs 49–117). In this case, the dispute over the appropriate drug quantity involves not the facts in the presentence report, which are largely undisputed, but whether the facts set out in the presentence report and the additional evidence provided by the government support the inferences that result in the base offense level recommended in the presentence report. As discussed below, the Court agrees that the facts do not support the inferences in the presentence report and therefore does not adopt the presentence report's total drug quantity calculation or the resulting guidelines offense level.

Based on the evidence recounted above, there is little doubt that the actual drug quantities involved in this conspiracy exceed the relatively meager amounts recovered during the investigation. Thus, the question is whether an approximation of drug quantity is appropriate, and if so what is an appropriate method to approximate the drug quantity to assign to Mr. Buzzard, given the evidence above. Application Note 12 to guideline section 2D1.1 provides that "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." According to the Seventh Circuit, "[e]stimates of the drug quantities attributable to the defendant are permissible, of course, so long as they are based on evidence possessing sufficient indicia of reliability and not 'nebulous eyeballing.'" *United States v. Howard*, 80 F.3d 1194, 1204 (7th Cir. 1994).

But before determining the proper approximation of drug quantity, the Court must determine what relevant conduct it is approximating. We begin with the guidelines. Sentencing guideline

9

section § 1B1.3(a)(1) provides that "relevant conduct" for sentencing purposes includes

> (A) all acts and omission committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . .

Thus, Mr. Buzzard may be held responsible not only for the methamphetamine he personally manufactured during the conspiracy, but also the reasonably foreseeable acts and omissions of his co-conspirators in furtherance of any "jointly undertaken criminal activity."

### A. The Court Does not Accept the Government's Approximation of the Drug Quantity Attributable to Mr. Buzzard Based on His Own Actions.

The government apparently seeks to approximate the amount of pseudoephedrine attributable to Mr. Buzzard based on his own acts during the conspiracy, using the 17.28 grams of pseudoephedrine recovered from Lamarco Beard's vehicle on August 29, 2010 and extrapolating from that amount to hold Mr. Buzzard responsible for 17.28 grams of pseudoephedrine for each of his 8 visits to the Plymouth home recorded on a pole cam, for a total of 138.24 grams of pseudoephedrine, or the equivalent 1382.4 kilograms marijuana.[5] Adding this to the methamphetamine and pseudoephedrine actually recovered while Mr. Buzzard was out of prison, would result in a total marijuana equivalency of 1862.44 kilograms, for a base offense level of 32. Interestingly, although the government does not address the scope of the jointly undertaken criminal activity, the substances recovered from the three vehicle stops and the methamphetamine lab in the woods outside the Plymouth residence are not directly linked to Mr. Buzzard's own actions and

---

[5]In its sentencing memorandum, the government inexplicably uses 17.2 grams as the base amount, rather than 17.28.

would only be attributable to him as reasonably foreseeable actions of others in furtherance of jointly undertaken criminal activity.

Mr. Buzzard, for his part, argues that none of the amounts of pseudoephedrine—whether actually recovered or extrapolated—are reliable because "[t]here is a serious failure of proof concerning the quantity of pseudoephedrine alleged to have been recovered during the course of the conspiracy." *See* Def. Response, DE 252 at 1. More specifically, he argues that it is impossible to tell from the PSR and Trooper Bikowski's testimony what the actual amount of pseudoephedrine recovered is because there is no evidence of a pill count or a reliable record of the total weight of pseudoephedrine. Mr. Buzzard asks the Court to hold him responsible solely for the amount of methamphetamine actually recovered. Interestingly, Mr. Buzzard also implicitly acknowledges that he can be held responsible for various acts by co-conspirators, including the April search (while he was incarcerated), the methamphetamine recovered in the woods in July, and the methamphetamine recovered during the traffic stop of Stephen Braasch in August. None of the evidence in the PSR or Trooper Bikowski links these quantities directly to Mr. Buzzard and thus he may only be held responsible for them as jointly undertaken criminal activity.

The Court finds that the method of extrapolating drug quantities urged by the government and the presentence report is too speculative and there is insufficient reliable evidence to prove, by a preponderance of the evidence, that Mr. Buzzard himself cooked 137.6 grams of pseudoephedrine into methamphetamine. It is true that a "multiplier method" is an acceptable way to calculate drug quantity in some instances—for example, when there is evidence of a regular transaction amount and an approximate number of transactions. *See United States v. Clark*, 538 F.3d 803, 813 (7th Cir. 2008) (approving drug quantity based on multiplying the cocaine sold in a specific transaction by

the number of months over which dealings occurred, when there was evidence that the specific transaction amount was the minimum amount per transactions and that deals had occurred on average once per month). In this case, although there is evidence that Mr. Buzzard was cooking at least once per week (although not necessarily every time he visited the residence, as the government and the presentence report assume) there is insufficient reliable evidence of the amount Mr. Buzzard himself cooked each time.

First, there is no evidence that Mr. Buzzard cooked 17.28 grams of pseudoephedrine on each of his recorded eight trips to the residence in August and September 2010. Trooper Bikowski admitted that there was no way to tell from the pole cam whether Mr. Buzzard cooked on each of those eight visits. Moreover, even if the Court assumes that Mr. Buzzard did cook every time he went to the house, Trooper Bikowski's testimony that Mr. Buzzard would cook whenever he had enough pseudoephedrine to do so undermines the position that he cooked at least 17.28 grams each time. This seems like the very sort of "nebulous eyeballing" repeatedly rejected by the Seventh Circuit. Also, as noted above, Mr. Buzzard was not present for any of the other seizures of drugs in the summer of 2010, so these amounts would be attributable only on a theory of reasonably foreseeable conduct in furtherance of jointly undertaken criminal activity, which the Court will discuss shortly.

On the other hand, the Court finds that Mr. Buzzard's solution would substantially understate the scale of the offense in this case—a wide-ranging conspiracy to manufacture and distribute methamphetamine in which Mr. Buzzard was more than a minor participant. First, there is now (especially with the exhibits the government attaches to its reply brief) ample evidence that law enforcement officers did, in fact, recover the amount of pseudoephedrine listed in the PSR and the

12

government's brief, and that these amounts reflect the weight of the pseudoephedrine itself, rather than the weight of the pills, as required by Application Note 10 to guideline section 2D1.1. Further, as discussed below, and implicitly acknowledged in his response brief, Mr. Buzzard may be held responsible for substantially more conduct than his own personal acts.

**B.     A Base Offense Level of 32 Is Nonetheless Appropriate Taking into Account the Reasonably Foreseeable Acts of Others in Furtherance of Jointly Undertaken Activity.**

Although the Court does not accept the government and presentence report's method of determining drug quantity, it independently concludes that a base offense level of 32 remains appropriate for other reasons. Under guideline section 1B1.3(a)(1)(B), Mr. Buzzard may be held responsible for all the acts of other conspirators that were "(A) in furtherance of the jointly undertaken criminal activity; and (B) reasonably foreseeable in connection with that criminal activity." 1B1.3, Note 2.  The Court is mindful of it's duty to make appropriate findings in support of that determination.  *See United States v. Salem*, 597 F.3d 877, 886 (7th Cir. 2010) ("Salem I").

   *1.     Scope of Jointly Undertaken Criminal Activity*

The scope of the jointly undertaken criminal activity is not necessarily the same as the scope of the conspiracy, but only as broad as a particular defendant agreed to jointly undertake. *Id.* In determining the scope of jointly undertaken criminal activity, the Court may consider any explicit or implicit agreement fairly inferred from the conduct of the defendant and others. *Id.*  But the Court need not provide a detailed analysis of the conduct of each co-defendant. *United States v. Cerna*, 676 F.3d 605, 610 (7th Cir. 2012).  The Seventh Circuit has identified several factors a district court may consider:

> (1) the existence of a single scheme, see *United States v. Adeniji*, 221 F.3d 1020, 1028 (7th Cir.2000); (2) similarities in modus operandi, *see id.* at 1028–29 (noting that the defendants "took virtually identical steps in setting up mailing addresses and

bank accounts for the fictional . . . vendors" closely in time); (3) coordination of activities among schemers, *see id.* at 1028 (multiple telephone calls between phones associated with the defendants confirmed that they were coordinating their activities); *United States v. Giang*, 143 F.3d 1078, 1081 (7th Cir.1998) (stating that the defendant's "close collaboration with his cohorts" established a joint undertaking); U.S.S.G. § 1B1.3 cmt. n.2, illus. (c)(8); (4) pooling of resources or profits, see *Adeniji*, 221 F.3d at 1028 (sharing of proceeds); U.S.S.G. § 1B1.3 cmt. n.2, illus. (c)(6); (5) knowledge of the scope of the scheme, *see United States v. Thomas*, 199 F.3d 950, 954 (7th Cir.1999); and (6) length and degree of the defendant's participation in the scheme, *see id.*

*United States v. Salem*, 657 F.3d 560, 564 (2010) ("Salem II").

In this case, all of these factors establish the scope of and Mr. Buzzard's participation in a joint criminal activity to manufacture methamphetamine with other cooks. To wit:

1. The facts in the PSR reveal a single scheme, overseen by Ms. Hite, to obtain pseudoephedrine and manufacture and distribute methamphetamine.

2. The cooks in this operation appear to have used a similar *modus operandi*, cooking methamphetamine using two-liter bottles in backyards or other areas surrounding the houses.

3. Ms. Hite's and Mr. Martin's statement to the police show that Mr. Buzzard was one of the "main cooks", cooking frequently both before his arrest in January 2010 and then again over the summer of 2010. The evidence also shows that he regularly worked with other cooks, especially Andy Mitchell (another active cook according to Ms. Hite's statement): first, Ms. Hite stated that Mr. Buzzard and Mitchell usually worked together; second, Mr. Buzzard was present with Mr. Martin (still another active cook) at the site of an active methamphetamine lab in January, a lab Mr. Buzzard himself brought to that location; and third, Trooper Bikowski made reference to a stabbing between Mr. Buzzard and Mitchell that occurred while they were cooking methamphetamine together.

14

4. The PSR states that it was Ms. Hite who purchased the pseudoephedrine (although Hite's statement also indicates that Mr. Buzzard would receive pills from a Jennifer Sapp and that his girlfriend, Nicole Garcia, was one of the smaller pill suppliers) and that it and the other precursors were stored at the houses for use by all the cooks, providing evidence of pooled resources. In addition, the conspiracy appears to have had a common source of anhydrous ammonia (Andy Mitchell worked with Steve Braasch and occasionally Dale Hite to steal anhydrous ammonia) and other supplies (Coleman fuel and lithium batteries).

5. The length (beginning in late 2009 and resuming after he was released from prison in May 2010) and depth of Mr. Buzzard's involvement (8 documented visits to the Plymouth property from mid-August to mid-September 2010, living at the Phillipa residence in January 2010 for approximately four weeks, and extensive involvement with many of those co-defendants as explained herein) with the conspiracy are evidence that he knew of the scope of the scheme.

6. As noted, the evidence demonstrates that Mr. Buzzard was deeply involved with the scheme in early 2010 and over the entire summer of 2010 until the October 7 search.

The Court therefore concludes that Mr. Buzzard was involved in joint criminal activity with several other individuals, including but not limited to Alcia Hite, Zachary Martin, Andy Mitchell, and Lamarco Beard. The scope of this joint criminal activity included the production of large amounts of methamphetamine beginning no later than January 2010 and ending no earlier than October 2010. Ms. Hite led this jointly undertaken criminal activity and managed the operation and coordinated its activities; various individuals supplied pseudoephedrine, which was then cooked into methamphetamine using a "one pot" method by a small group of individuals, including Mr. Buzzard,

who often worked with other cooks. The scope of the criminal activity that Mr. Buzzard himself undertook, and for which he may be held responsible under the guidelines, however, does not include the time during which he was incarcerated and thus not an active member of the conspiracy. Further, the Court finds that the conduct of other co-conspirators was done in furtherance of criminal activity jointly undertaken with Mr. Buzzard, including Lamarco Beard, who delivered large amounts of pseudoephedrine to Alicia Hite and others, and others who manufactured methamphetamine at the South Bend and Plymouth residences.

 2. *Reasonable Foreseeability*

Based on this same evidence, the Court also concludes that Ms. Hite's purchases of pseudoephedrine from Lamarco Beard were within the scope of the jointly undertaken criminal activity described above and reasonably foreseeable by Mr. Buzzard. According to the Seventh Circuit,

> [t]he most relevant factor in determining the reasonable foreseeability of the conduct engaged in by coconspirators is the scope of the defendant's agreement with the conspirators. Thus, reasonable foreseeability means more than subjective awareness that a drug distribution network exists; instead, the individual defendant may be held responsible for the conduct of coconspirators if that defendant has demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or through his conduct.

*United States v. James* 40 F.3d 850, 870 (7th Cir. 1994), *vacated on other grounds*, 516 U.S. 1022 (1995) (internal marks and citations omitted).

Based on all of the above, the Court concludes that Mr. Buzzard was manufacturing methamphetamine on a regular basis between late May and October 2010 and that he was frequently present at the Plymouth residence. He had to know of the large amounts of pseudoephedrine and other precursors at the house in order to go about his cooking, and he had to know that someone was

providing that pseudoephedrine. While the evidence does not provide details of any specific interaction between Mr. Beard and Mr. Buzzard, it is not necessary that Mr. Buzzard actually *knew* of Mr. Beard's actions, so long as it was reasonably foreseeable that *someone* was providing pseudoephedrine in large amounts. *See United States v. Hernandez*, 325 F.3d 811, 817 (7th Cir. 2003) ("A defendant need not know of a co-conspirator's actions for those actions reasonably to be foreseeable to the defendant."). Thus the entire manufacturing conspiracy was both jointly undertaken criminal activity and reasonably foreseeable to Mr. Buzzard for the period during which he was active in the conspiracy. *See* U.S.S.G. 1B1.3(a)(1)(B) & cmt. 2; *Salem*, 657 F.3d at 564.

   3.   *Conservative Approximation of Pseudoephedrine Delivered During Mr. Buzzard's Participation in the Conspiracy*

Because the Court finds that Mr. Buzzard is responsible for all the pseudoephedrine delivered to the Plymouth residence during the period he was active in the conspiracy, regardless of whether he personally used that pseudoephedrine to manufacture methamphetamine, the Court will base its drug quantity finding on an approximation of the amount of pseudoephedrine that Lamarco Beard brought to the residence during that period.

Ms. Hite's uncontested statement to the police establishes that Mr. Beard brought between 10–20 boxes of pseudoephedrine to the Plymouth residence at least 2 times a week. When Mr. Beard was stopped on August 29, 2010, he had 17.28 grams of pseudoephedrine in his possession—and the government has verified that this amount reflects the weight of the pseudoephedrine, not the weight of the pills, and is based upon pills recovered not estimates. Trooper Bikowski also confirmed that the 17.28 grams recovered in the traffic stop was a normal to small-than-normal delivery by Mr. Beard. *See* DE 263 at 42. Assuming, very conservatively, that this reflected a delivery toward the upper end of the range Ms. Hite suggested, and even that Mr. Beard brought

only half that amount twice a week, the Court could conclude that Mr. Beard was only delivering at least 17.28 grams of pseudoephedrine per week *on average* and still establish the drug quantity here.

Other than the visits recorded on the pole cam, there is nothing before the Court regarding when Mr. Buzzard rejoined the conspiracy following his release from prison. If the Court assumed that he reconnected with his friends almost immediately after release, he would have been active for approximately four months, or 16 weeks. This would convert to 276.49 grams of pseudoephedrine, the equivalent of 2764.9 kilograms of marijuana. More conservatively, if the Court only considered the six- to eight-week period observed on the pole cam, this would still extrapolate to between 103.68 and 138.24 grams of pseudoephedrine, or the equivalent of between 1036.8 and 1382.4 kilograms of marijuana. Regardless of the approach, however, the entire range falls safely within the range specified for base offense level 32 (at least 1,000 KG but less than 3,000 KG marijuana). Finally, the Court notes that it does not consider the amounts of pseudoephedrine or methamphetamine actually recovered during this same period. Ms. Hite stated that Mr. Beard was the main pseudoephedrine supplier for the conspiracy, so there is a possibility that the amounts actually recovered have already been taken into account in the above calculation. The half-gram of methamphetamine and 2.63 grams of marijuana recovered at the Philippa St. residence in January 2010 are not traceable to Mr. Beard's deliveries, and thus are properly included in the total drug quantity, but these amounts do not affect the total offense level. The Court reiterates that the base offense level of 32 reflects a very conservative estimate—it does not include amounts of pseudoephedrine attributable to other suppliers like Buzzard's own girlfriend, nor any additional estimates of pseudoephedrine or methamphetamine from the period preceding the January 2010

search of the Philippa St. residence.

## IV. Conclusion

Thus, the Court finds that the appropriate base offense level under guideline section 2D1.1(c), given the drug quantities discussed above, is 32. This is then adjusted upward by two levels under section 2D1.1(b)(1) because Mr. Buzzard possessed a firearm in connection with the offense, resulting in an adjusted offense level of 34. The Court therefore **ADOPTS AS MODIFIED** the findings in the presentence report, but **FINDS** that the appropriate adjusted offense level is 34, before any adjustment for acceptance of responsibility or any departures authorized under the guidelines. The Court further **ORDERS the parties to file any sentencing memoranda** regarding the factors set out in 18 U.S.C. § 3553(a) and the reasonable sentence in this case **within 14 days of the date of this order.** The Court will contact counsel to schedule the final sentencing hearing.

SO ORDERED.

ENTERED:  October 29, 2012

/s/ JON E. DEGUILIO
Judge
United States District Court